UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REBECCA ANGULO,

                        Plaintiff,

        -v-

36TH STREET HOSPITALITY LLC, INDIVIDUALLY AND
D/B/A "TAJ II", 36TH STREET HOSPITALITY LLC,
INDIVIDUALLY AND D/B/A "SUITE36",

                        Defendants.

CIVIL ACTION NO.: 19 Civ. 5075 (GBD) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE GEORGE B. DANIELS**, United States District Judge:

On May 30, 2019, Plaintiff Rebecca Angulo filed this diversity action under New York State and New York City law, seeking damages for injuries she suffered as a result of sexual harassment and discrimination on the basis of her sex and gender, naming as Defendants PAMDH Enterprises Inc., individually and d/b/a "Katra Lounge" ("Katra"); 36th Street Hospitality LLC, individually and d/b/a "Taj II" ("Taj II"); and 36th Street Hospitality LLC, individually and d/b/a "Suite36" ("Suite36") (Katra, Taj II, and Suite36, collectively, "Defendants").  (ECF No. 1 at 1).  Angulo, who worked as a waitress at Defendants' bars, alleges that David Casey ("Casey"), Defendants' owner, sexually assaulted her at his home and subsequently sexually harassed her while she was at work, leading to her constructive discharge and extensive emotional distress including multiple suicide attempts.  (ECF No. 54 at 7, 12; see generally ECF No. 55-4).  Angulo's claims against Katra were dismissed with prejudice.  (ECF No. 30).  After the remaining Defendants, Taj II and Suite36, defaulted (the "Default Defendants"), the Honorable George B. Daniels ordered that judgment

be entered in Angulo's favor against the Default Defendants, and referred the matter to the undersigned for an inquest on damages.  (ECF Nos. 34, 46).

For the reasons set forth below, I respectfully recommend that the District Court enter a default judgment against the Default Defendants awarding Angulo:   (1) $498,047.55 in compensatory damages (comprised of, after mitigation, back pay, front pay, and emotional distress damages); (2) $ 100,000 in punitive damages; (3) prejudgment interest at the rate of 9% on the amount of back pay awarded, that is, $97,109.79; (4) post-judgment interest pursuant to 28 U.S.C. § 1961(a); (5) $22,845 in attorneys' fees; and (6) $780.66 in costs.

## I.    BACKGROUND

Because the Default Defendants have defaulted in this action, the Court accepts as true all well-pleaded factual allegations in the complaint, except as to damages.  See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint." (quoting Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004))); Whitehead v. Mix Unit, LLC, No. 17 Civ. 9476 (VSB) (JLC), 2019 WL 384446, at *1 (S.D.N.Y. Jan. 31, 2019), adopted by 2019 WL 1746007 (S.D.N.Y. Apr. 18, 2019).

### A.  Factual Background[1]

#### 1.  Angulo's work for Defendants

Katra is a restaurant and lounge located at 217 Bowery in New York City and operated by PAMDH Enterprises Inc.  (ECF No. 1 ¶¶ 5–6).  36th Street Hospitality LLC operated the businesses

---

[1]The factual background is set forth in the Complaint (ECF No. 1) and supported in Angulo's affidavits, her counsel's declarations, and their accompanying exhibits (ECF Nos. 43, 55).  The Court notes that there are minor, immaterial differences between the two affidavits Angulo has submitted (dated January 21, 2020

known as Taj II and Suite36, which are also restaurants and lounges located at 48 West 21st Street and 16 West 36th Street, respectively.  (Id. ¶¶ 7–13).  Non-party Casey was and is the owner of Katra, Taj II, and Suite36.  (Id. ¶ 14).

In early 2014, Angulo was looking for a job and was referred to Casey's girlfriend, Merylin Mitchell ("Mitchell"), who was looking for a babysitter for their daughter.  (ECF No. 55-4 ¶ 2).  On a weekly basis throughout 2014, Angulo babysat for Mitchell and Casey's daughter.  (Id. ¶ 3).  In May 2015, Mitchell told Angulo that Casey was looking to hire a waitress for Katra, Taj II, and Suite36 and encouraged Angulo to pursue this opportunity.  (Id. ¶¶ 4–5).  Shortly thereafter, Casey offered Angulo a waitress position at Katra and Taj II.  (Id. ¶ 4).  Because she had no waitressing or bartending experience, Angulo believes Casey hired her based on her appearance and with the aim of getting "closer to [her] romantically and sexually."  (Id.)  On May 23, 2015, Angulo began training as a waitress at Katra, and shortly thereafter began working at Taj II.  (Id. ¶ 7).

On December 21, 2015, Angulo attempted suicide after "trying to cope with a prior sexual assault in 2014."  (ECF No. 55-4 ¶ 8).  While she was hospitalized for ten days, Angulo's mother attempted to notify her manager at Katra, but did not get a response.  (Id.)  After she was released from the hospital, Defendants did not place her back on the work schedule, so in January 2016, Angulo asked Casey if she could meet in his New York City office to discuss returning to work.  (Id. ¶¶ 8–9).  After Casey "insisted," Angulo "reluctantly agreed" to meet him at a diner in Wayne, New Jersey, at which time Casey informed her that "he would allow [her] to return to work at

---

(ECF No. 43-4) and May 26, 2020 (ECF No. 55-4)), and unless otherwise indicated, relies on the May 26, 2020 affidavit (ECF No. 55-4).

Katra." (Id. ¶ 9).  From January 2016 until the end of April 2016, Angulo worked at Katra and Taj II, earning $2.13 to $7.50 per hour, full-time, plus tips.  (Id. ¶ 10).  At the end of April, Angulo began working full-time at Suite36.  (Id. ¶ 11).  While she was working for Defendants, Angulo continued babysitting Casey and Mitchell's daughter on her days off.  (Id. ¶ 12).

### 2.  The May 9, 2016 sexual assault

On May 9, 2016, Angulo babysat Casey and Mitchell's daughter before school, after school, and throughout the evening.  (ECF No. 55-4 ¶¶ 13–14).  Around 11:30 p.m., Casey returned home, asked Angulo if she ate, and said, "Let's talk about what's been going on with you lately.  Your sales have been bad, and since you've come back from the hospital, you're not acting like yourself."  (Id. ¶ 15).  Angulo replied that she was "fine."  (Id.)  Casey knew that Angulo had been diagnosed with bipolar disorder and borderline personality disorder following her December 2015 hospitalization, that she had completed an in-patient rehabilitation program, and that she was taking medications for her symptoms.  (Id. ¶ 16).  Casey "tried to dissuade" Angulo from taking her medications, telling her, "I heard you tried to hurt yourself.  You have to be careful . . . You shouldn't take your meds . . . Just go back to drugs and drinking . . . Don't try to be sober."  (Id. ¶ 17).  Angulo became "anxious and vulnerable," and Casey continued to try to persuade her to break her sobriety, offering her a bottle of beer.  (Id. ¶¶ 17–18).

Angulo initially refused, not having consumed alcohol in over five months, but after Casey pressured her to "just drink it," she began to drink.  (ECF No. 55-4 ¶ 18).  Angulo started to feel weak and light-headed, and Casey told her that he wanted to help her.  (Id. ¶ 19).  Casey approached Angulo and kissed her on the lips, which she did not give him permission to do.  (Id.)  Angulo froze, but believed that she needed to "reciprocate" to keep her job.  (Id.)  Casey pulled

4

her by the hand, and led her to the basement, where he pushed her to the floor, groped, and kissed her. (Id. ¶ 20). Angulo resisted, telling Casey that she had her period, but he told her, "I don't care, it's fine," and continued undressing her. (Id.) Angulo felt too weak to push Casey away, and had flashbacks to a 2014 incident in which she was sexually assaulted. (Id. ¶¶ 8, 20). Casey then raped Angulo, including forced intercourse and forced oral sex. (Id. ¶ 20). Because of her intoxication and mental state, Angulo was "incapable of consenting to any sexual contact" with Casey, felt humiliated and distraught, and repeatedly pleaded with him to let her go. (Id. ¶ 21).

After the assault, Casey invited Angulo to travel to Miami with him the following weekend, which she refused. (ECF No. 55-4 ¶ 22). He then told her he wanted to "travel the world together" and wanted to "see [her] more often." (Id.) Angulo left Casey's home, feeling distraught and worried that no one would believe her. (Id.)

### 3.  Further sexual harassment at Suite36

On May 12, 2016, Angulo returned to her daytime shift at Suite36, still feeling distraught but not expecting to see Casey there during the daytime and needing to earn an income to pay her bills. (ECF No. 55-4 ¶ 23). Around 4:00 p.m. that day, Casey arrived at Suite36, approached Angulo from behind, came close to her ear, and said, "You look so good. I wanted to come and say hi to you." (Id. ¶ 24). Angulo panicked, told Casey to leave her alone, and walked to the back of the restaurant. (Id.) Casey's conduct triggered memories of the sexual assault and caused Angulo to contemplate suicide and relapse into drug and alcohol use. (Id. ¶ 25). Over the next three weeks, Casey returned to Suite36 and continued his sexual harassment of Angulo, telling her that he missed her and wanted to see her again. (Id. ¶¶ 26–27). Angulo rejected Casey's

advances, but his ongoing harassment and the memories of the sexual assault caused her "to experience severe symptoms of bipolar disorder, borderline personality disorder, and trauma, and develop post-traumatic stress disorder ('PTSD')." (Id. ¶¶ 27–28).

### 4. Angulo's ongoing trauma and additional suicide attempts

On June 1, 2016, as a result of Casey's sexual assault, Angulo attempted suicide by overdosing on drugs, slitting her wrists, and drinking chemicals. (ECF Nos. 55-4 ¶¶ 29–30; 55-5). Family members found her and took her to St. Joseph's Regional Center in Paterson, New Jersey, where she remained in the psychiatric unit for five days. (ECF No. 55-4 ¶ 30). Angulo quit her job at Suite36, and argued with her family members about filing a police report against Casey, ultimately deciding not to file a report, "[f]earing further harassment." (Id. ¶¶ 31–32; see Transcript of the July 7, 2020 hearing ("Tr.") at 15–16[2] (Angulo testified that her mother "didn't want [her] to tell anyone . . . that put a big divide between [her] and [her mother].")). Angulo made several social media posts about her emotional state, describing feeling "hurt, traumatized, and humiliated" and her desire not to continue living. (ECF Nos. 55-4 ¶ 33; 55-6).

Over the next two years, Angulo participated in a voluntary detoxification program and attended in-patient and out-patient treatments and therapy. (ECF No. 55-4 ¶ 34). From June 14, 2016 to October 2016, Angulo attended a rehabilitation program at Memorial Healthcare System's Wellness Resource Center in Boca Raton, Florida, at which time she was diagnosed with PTSD, major depression, generalized anxiety disorder, bipolar disorder, borderline personality disorder, and substance abuse. (Id. ¶ 35). Her therapist observed that Angulo had "decreased

---

[2] The transcript of the July 20, 2020 hearing has not been filed on the public docket, but can be obtained by the parties on request. The Court cites to the page numbers of the preliminary transcript that was provided to Chambers on the day of the hearing.

energy, helplessness, hopelessness, excessive anxiety, worry, panic, muscle tension, restlessness, irritability[,] and mood swings." (Id.)

From October 2016 until the end of November 2016, Angulo was treated at Seventy-Seven Recovery in West Palm Beach, Florida, where she attended weekly one-on-one psychotherapy sessions during which she discussed Casey's sexual assault and her suicide attempts. (ECF No. 55-4 ¶ 36).

From December 8, 2016 until February 8, 2017, Angulo underwent therapy and rehabilitation treatment at Royal Life Centers, LLC. (ECF No. 55-4 ¶ 37). Angulo then returned to her home in New Jersey. (Id.) On July 21, 2017, Angulo sought therapy at Memorial Healthcare System/Mind Body Wellness Center in Hollywood, Florida, and began monthly therapy sessions starting on August 1, 2017. (Id. ¶¶ 38–39).

After returning to New Jersey, Angulo began dating Roberto Sozzi ("Sozzi"), but initially did not tell him about Casey's sexual assault. (ECF No. 55-4 ¶ 40). On August 31, 2018, Angulo and Sozzi were at 24 Hour Fitness in Wayne, New Jersey, when Casey approached her, tapped her on the shoulder, and said, "Hey." (Id. ¶¶ 40–41). Angulo "immediately felt nauseous and faint," gathered her belongings, and shortly thereafter, left the gym with Sozzi. (Id. ¶ 41). They cancelled their memberships and Angulo never returned to the gym; the same day, Angulo had a panic attack, triggered by seeing Casey. (Id. ¶¶ 41–43; see also ECF No. 55-17 ¶¶ 3–5).

In September 2018, Sozzi picked Angulo up from her job at Maggie's Tavern in Wayne, New Jersey. (ECF No. 55-4 ¶ 44). They argued about seeing Casey, and Angulo became increasingly upset, to the point where she swung a baseball bat, making holes in the walls and

ceiling, destroying furniture, and repeatedly striking a tree.  (Id.; see also ECF No. 55-17 ¶¶ 9–10).

In November 2018, Angulo and Sozzi, while driving in a car, had another argument about seeing Casey at the gym.  (ECF No. 55-4 ¶ 45).  Angulo became upset, had a panic attack, and tried to jump out of the car, but Sozzi pulled her back in.  (Id.; see also ECF No. 55-17 ¶ 11).  Around November 23, 2018, while watching an action movie with friends in her basement, Angulo had another panic attack triggered by memories of Casey's sexual assault.  (ECF No. 55-4 ¶ 46; see also ECF No. 55-17 ¶ 12).

On September 24, 2019, Angulo and Sozzi were discussing her lawsuit during a telephone call, when Angulo became upset at Casey's refusal to participate in the litigation, which made her "feel like he would not be held accountable for his actions."  (ECF No. 55-4 ¶ 47).  Angulo told Sozzi that she did not want to continue living and "was going to try to end [her] life."  (Id.; see also ECF No. 55-17 ¶ 13).  Sozzi contacted Angulo's aunt, with whom she was living, and her aunt returned home to take Angulo to Kings County Hospital in Brooklyn, where she was kept overnight for observation.  (ECF Nos. 55-4 ¶¶ 47–48; 55-17 ¶¶ 13–14).  Angulo was admitted for a mental health evaluation and referred to a psychiatrist, who diagnosed her with severe depression.  (ECF No. 55-4 ¶¶ 48–49).  Between October 19 and October 30, 2019, Angulo met with a psychiatrist, Geoffrey Peckover, MD, who treated her for PTSD and binge eating disorder and prescribed her medications for mood stabilization and appetite control.  (Id. ¶ 50).

Beginning on January 23, 2020, Angulo sought monthly therapy and psychiatric treatment at Interborough Developmental, where her therapist diagnosed her with bipolar disorder, PTSD, and borderline personality disorder.  (ECF No. 55-4 ¶ 51).

Angulo remains anxious that she will see Casey again, either in Wayne, New Jersey, or New York City.  (ECF No. 55-4 ¶¶ 52–53).  She has weekly nightmares that Casey is following her, has trouble sleeping, experiences anxiety attacks, and has recurring thoughts about suicide.  (Id. ¶¶ 54–55; see also ECF Nos. 55-17 ¶¶ 15–17; Tr. at 13).  Although therapy has helped Angulo work through her trauma, she still has panic attacks when reminded of Casey's sexual assault, has a hard time trusting people, and repeatedly harms herself by cutting, banging her head, punching walls, and bruising her hand.  (ECF No. 55-4 ¶¶ 56–58).  Angulo previously battled an eating disorder, which was reaggravated by Casey's assault, and her relationship with Sozzi suffered to the point that they eventually broke up.  (Id. ¶¶ 59–61; see Tr. at 11–12).

On July 20, 2020, Angulo testified about the extent of her emotional distress resulting from Casey's sexual assault and sexual harassment.  (See Tr.).  Angulo testified that she is "uncomfortable with men" because she fears being assaulted.  (Id. at 17).  As a result, she is "very protective" of herself.  (Id.)  She feels that Casey "took away [her] dignity," and is worried that the trauma he inflicted on her will "never go away."  (Id. at 17–18).  She remains under the care of a psychiatrist, whom she sees monthly, and a therapist, whom she sees weekly.  (Id. at 13).  She acknowledged that she has made progress since the assault, including now working as a contact tracer and starting her college education, in which she is pursuing a Bachelors' degree in psychology.  (Id. at 13–14).

### 5. Angulo's subsequent work history

Due to her ongoing trauma and recovery, Angulo has found it difficult to find a job that pays the same rate as she earned while working for Defendants, which was $1,000 to $1,500 per week.  (ECF No. 55-4 ¶¶ 62–63).  She is particularly uncomfortable working with men, because

of the way Casey treated her.  (Tr. at 17).  For the period January 1, 2016 until her resignation on

June 1, 2016, Angulo earned $15,135 at Katra and $2,266.25 at Suite36, totaling $17,401.25.  (ECF

Nos. 55-4 ¶ 64; 55-9 at 2).

From September 2016 until February 2017, Angulo worked part-time at Boca Vapes,

where she earned $10.00 per hour, for a total of $6,757.68.  (ECF Nos. 55-4 ¶¶ 65–66; 55-9 at 2;

55-10 at 2).[3]  In February 2017, Angulo worked as a waitress at Havana 1957, where she earned

$2.00 per hour plus tips, for a total of $95.34.  (ECF Nos. 55-4 ¶ 67; 55-11 at 2).  From March 16,

2017 until September 7, 2017, Angulo worked full-time for AutoNation Honda of Hollywood,

earning $11.30 per hour, for a total of $12,537.33.  (ECF Nos. 55-4 ¶ 68; 55-12 at 2).

In September 2017, Angulo returned to New Jersey to live with her mother, and in

December, enrolled in a car wrapping course at "Mobile Technical Training."  (ECF No. 55-4

¶¶ 69–70).  From March 2018 to May 2018, Angulo was an intern at Illmatic Wraps, where she

earned $525.  (Id. ¶ 71).  From May 2018 until June 2018, Angulo worked as a Vinyl Installer at

All in One Stop Shop, where she earned $525 per week, for a total of $2,000.  (Id. ¶ 72).

From July 2018 until September 2018, Angulo worked as a part-time waitress at Maggie's

Tavern, where she earned $450 per week, for a total of $3,125.05.  (ECF Nos. 55-4 ¶ 73; 55-13 at

2).  Angulo left this position after she felt triggered by working in close proximity to men and was

reminded of the sexual harassment she endured while working for Defendants.  (ECF No. 55-4

¶ 73).  In the fall of 2018, Angulo worked for one week as a BDC Representative at Route 46

Nissan, earning a total of $430.00.  (Id. ¶ 74).  In December 2018, she worked for two weeks as a

---

[3] Angulo's declaration misstates her 2016 earnings from Boca Vapes at $4,490.60 (ECF No. 55-4 ¶ 65), but her earnings on the corresponding W-2 are $4,490.50 (ECF No. 55-9 at 2).

Burrito Maker at Bubba Koo's Burritos, earning $10.00 per hour, for a total of $242.46.  (Id. ¶ 75; ECF No. 55-14 at 2).

From February 2019 until March 2019, Angulo worked full-time as a Daycare Assistant for Little Scholars Playhouse, earning $10.00 per hour, for a total of $1,516.95.  (ECF Nos. 55-4 ¶ 76; 55-15 at 2).   From March 21, 2019 until May 24, 2019, Angulo worked full-time as a BDC Representative for Route 23 Kia, earning $500 per week plus commissions.[4]  (ECF No. 55-4 ¶ 77). From August 22, 2019 to December 27, 2019, Angulo worked as a BDC Representative/Delivery Coordinator for SMG Automotive Holdings LLC/Brooklyn Chrysler, earning $16.50 per hour plus commissions, for a total of $12,033.70.  (Id. ¶ 78; ECF No. 55-16 at 4–5).  From April 21, 2020 until the end of May, Angulo worked as a 311 Operator at Eclaro, earning $20 per hour, for a total of $2,542.04.  (ECF No. 55-4 ¶ 79).  Since the beginning of June 2020, she has worked for the City of New York as a COVID-19 contact tracer, earning $23 per hour for eight hours of work per week. (Tr. at 4).[5]

Angulo states that since the summer of 2016, she has earned much less than she did while working for Defendants, and has "been severely traumatized by the sexual harassment and assault [she] endured while working for" them, which is a trauma she expects to live with "for the rest of [her] life."  (ECF No. 55-4 ¶ 80).

---

[4] Angulo does not provide a total amount earned from Route 23 Kia, but the Court estimates the total to be about $4,500 ($500 x 9 weeks).  March 21, 2019 until May 24, 2019, including the end date, totals 9 weeks and 2 days.
[5] Although Angulo stated that she was paid $23 "per week," the Court infers from the context that she meant "per hour."  (See Tr. at 4).  The Court estimates her total earnings through the date of this Report and Recommendation to be $1,594.66 ($797.33 x 2).  (See infra n.10).

B. **Procedural Background**

On May 30, 2019, Angulo filed the complaint (the "Complaint") asserting claims under the New York State Human Rights Law, N.Y. Exec. Law § 296 (the "NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1) (the "NYCHRL"), based on sex and gender discrimination, sexual harassment, a hostile work environment, and constructive discharge. (ECF Nos. 1 at 1; 55[6] ¶¶ 3–4). On June 12, 2019, Defendants were served with two copies of the Summons and Complaint via the New York Secretary of State. (ECF Nos. 55 ¶ 5; 55-2 at 2; see ECF No. 8). Defendants' answers were due on July 3, 2019, but they did not file an answer or otherwise respond. (ECF No. 55 ¶¶ 6–7).

On July 17, 2019, Gina Nicotera of Landman Corsi Ballaine & Ford P.C., filed a notice of appearance on behalf of Katra only. (ECF No. 55 ¶ 8; see ECF Nos. 15–16). Katra then moved to dismiss, attaching in support a declaration from Casey, who represented that he was Katra's "Owner." (ECF No. 55 ¶ 9; see ECF Nos. 21–24). By Stipulation and Order dated September 24, 2019, Angulo's claims against Katra were dismissed with prejudice. (ECF No. 30).

On October 22, 2019, in response to Angulo's request, the Clerk of the Court issued a Certificate of Default as to the Default Defendants. (ECF No. 55 ¶¶ 10–11; see ECF Nos. 27, 34). On January 21, 2020, Angulo filed the Motion, which was served on the Default Defendants. (ECF No. 55 ¶¶ 14–15; see ECF Nos. 43–44). On February 5, 2020, Judge Daniels issued an order

---

[6] Angulo's lead counsel, Silvia C. Stanciu ("Stanciu"), submitted two declarations in support of the Motion, one dated January 21, 2020 (ECF No. 43) and one dated May 26, 2020 (ECF No. 55). Because the May 26, 2020 declaration is the most complete in providing the information the Court requested to conduct this inquest, the Court will refer to that declaration (ECF No. 55) unless otherwise noted.

directing that judgment be entered in Angulo's favor against the Default Defendants, and referred the matter to the undersigned for an inquest on damages. (ECF No. 46).

On February 6, 2020, the Court issued an order directing Angulo to submit her proposed findings of fact and conclusions of law by March 5, 2020, and directing the Default Defendants to submit their response by March 19, 2020. (ECF No. 47). The Court warned the Default Defendants that if they failed to respond to Angulo's submissions or contact the Court to request an in-court hearing, the Court would issue a report and recommendation concerning damages on the basis of Angulo's written submissions without an in-court hearing. (Id.) The Court subsequently granted Angulo extensions of time to file her proposed findings of fact and conclusions of law. (ECF Nos. 50–51). On May 26, 2020, Angulo filed her memorandum of law in support of findings of fact and conclusions of law regarding damages, accompanied by supporting declarations, affidavits, and exhibits (the "Damages Submission"). (ECF Nos. 54–55).[7] On July 10, 2020, the Court issued an order directing Angulo and her counsel to appear for an in-court hearing on July 20, 2020. (ECF No. 58). On July 20, 2020, the Court heard in-person testimony from Angulo. (ECF No. 59).

To date, the Default Defendants have not responded to the Damages Submission, nor did they appear at the in-court hearing.

## II.    DISCUSSION

### A.  Default Judgment and Liability

A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158

---

[7] Angulo also submitted copies of her medical records under seal. (ECF No. 53).

(2d Cir. 1992).  A defendant's default is deemed "a concession of all well-pleaded allegations of liability," but it is not deemed an "admission of damages."  Rovio Entm't, Ltd. v. Allstar Vending, Inc., 97 F. Supp. 3d 536, 545 (S.D.N.Y. 2015).  "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  Am. Jewish Comm. v. Berman, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313, at *3 (S.D.N.Y. June 15, 2016) (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)), adopted by 2016 WL 4532201 (S.D.N.Y. Aug. 29, 2016).

A plaintiff "bears the burden of establishing her entitlement to recovery and thus must substantiate her claim with evidence to prove the extent of damages."  Dunn v. Advanced Credit Recovery Inc., No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *2 (S.D.N.Y. Mar. 1, 2012), adopted by 2012 WL 1114335 (S.D.N.Y. Apr. 3, 2012).  The evidence the plaintiff submits must be admissible.  Poulos v. City of New York, No. 14 Civ. 3023 (LTS) (BCM), 2018 WL 3750508, at *2 (S.D.N.Y. July 13, 2018), adopted by 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018); see House v. Kent Worldwide Mach. Works, Inc., 359 F. App'x 206, 207 (2d Cir. 2010) (summary order) ("[D]amages must be based on admissible evidence.").  The plaintiff must demonstrate that the compensation she seeks "relate[s] to the damages that naturally flow from the injuries pleaded."  Am. Jewish Comm., 2016 WL 3365313, at *3 (quoting Greyhound, 973 F.2d at 159).

Where the damages are "not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence."  Am. Jewish Comm., 2016 WL 3365313, at *4 (internal citation omitted).  If the documents the plaintiff has submitted provide a "sufficient basis from which to evaluate the fairness of" the requested

damages, the court need not conduct an evidentiary hearing.  Fustock v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); see Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (court may determine appropriate damages based on affidavits and documentary evidence "as long as [the court has] ensured that there [is] a basis for the damages specified in the default judgment" (internal citation omitted)).

The Default Defendants' default equates to a concession of liability as to the allegations in Angulo's complaint, which asserted claims under the NYSHRL and the NYCHRL for sex and gender discrimination, sexual harassment, a hostile work environment, and constructive discharge.  (ECF No. 1 ¶ 1).  The Court still must look to the Complaint to determine whether Angulo's allegations are prima facie sufficient to demonstrate federal subject matter jurisdiction as well as liability for each of the claims asserted.  See Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas, 509 F. App'x 54, 56 (2d Cir. 2013) (summary order) (liability of defaulting defendant depends on whether "allegations are sufficient to state a cause of action"); Bleecker v. Zetian Sys., Inc., No. 12 Civ. 2151 (DLC), 2013 WL 5951162, at *4–5 (S.D.N.Y. Nov. 1, 2013) (evaluating whether plaintiff had adequately pled federal jurisdiction and elements of breach of contract claim); Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012) ("Without a response from Defendants, this Court must first determine whether the allegations in Plaintiff's Complaint are sufficiently pleaded to establish Defendants' liability.").  The Court will therefore assess whether Angulo has properly established federal jurisdiction as well as the elements of each of her claims.

### 1.   Diversity Jurisdiction

Angulo is a resident of the State of New Jersey.  (ECF No. 1 ¶ 4).  36th Street Hospitality

LLC is a foreign limited liability company operating under the laws of the State of Delaware.

(Id. ¶¶ 7, 11).  Angulo is seeking damages well in excess of $2 million (see ECF No. 54 at 29), which

exceeds the $75,000 threshold required by 28 U.S.C. § 1332.  Therefore, the Court has diversity

jurisdiction over this matter.  See Bleecker, 2013 WL 5951162, at *4.

### 2.   Liability under the NYSHRL and NYCHRL

The Default Defendants were Angulo's "employer[s]," and were subject to the NYSHRL

and NYCHRL.  See N.Y. Exec. Law § 292(5) ("The term 'employer' shall include all employers within

the state."); Id. § 296(1) (describing prohibited forms of discrimination in the employment

context); N.Y.C. Admin. Code § 8-102 ("[T]he term 'employer' does not include any employer that

has fewer than four persons in the employ of such employer at all times during the period

beginning twelve months before the start of an unlawful discriminatory practice and continuing

through the end of such unlawful discriminatory practice, provided however, that in an action for

unlawful discriminatory practice based on a claim of gender-based harassment pursuant to

subdivision one of [S]ection 8-107, the term 'employer' shall include any employer, including

those with fewer than four persons in their employ."); Id. § 8-107(1)(a) (describing prohibited

forms of discrimination in the employment context); see also Harris v. NYU Langone Med. Ctr.,

No. 12 Civ. 454 (RA) (JLC), 2013 WL 3487032, at *11 (S.D.N.Y. July 9, 2013) ("An employer-

employee relationship is . . . required to sustain . . . claims under the NYSHRL and the NYCHRL."),

modified on other grounds and adopted by 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013).  As the

owner of the lounges where Angulo worked, Casey was a supervisory employee whose acts may be imputed to the Default Defendants.  See N.Y.C. Admin Code § 8-107(13)(b)(1).

"[T]o prove a prima facie case for sexual harassment," Angulo must prove "by a preponderance of the evidence that (1) [s]he was subjected to sexual conduct in the workplace that constituted discrimination based on [her] sex, and (2) that such conduct was unwelcome." Caravantes v. 53rd St. Partners, LLC, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *13 (S.D.N.Y. Aug. 23, 2012) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64–68 (1986)).[8]  To show that she was a victim of a hostile work environment, Angulo must prove that "the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . her work environment . . . ."  Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003), abrogated on other grounds by Vance v. Ball State Univ., 570 U.S. 421 (2013).

Proving a hostile work environment requires Angulo to show both "objective and subjective elements:  the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their bod[ies] is usually not one of them."  Redd v. N.Y. Div. of Parole, 678

---

[8] NYSHRL claims are analyzed under the same framework as claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), et seq.  See Pucino v. Verizon Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010); Munson v. Diamond, No. 15 Civ. 425 (DAB) (BCM), 2017 WL 4863096, at *5 (S.D.N.Y. June 1, 2017), adopted by 2017 WL 4862789 (S.D.N.Y Oct. 26, 2017).  Therefore, because the NYCHRL "'provides even broader protection than its federal and state counterparts,'" establishing liability under the NYSHRL necessarily establishes liability under the NYCHRL.  Munson, 2017 WL 4863096, at *5 (quoting Styka v. My Merchs. Servs. LLC, No. 14 Civ. 6198 (ENV) (VMS), 2016 WL 3866550, at *2 (E.D.N.Y. July 13, 2016)).

F.3d 166, 179 (2d Cir. 2012) (internal citations omitted).  An employer is vicariously liable for the sexual harassment perpetrated by an employee with supervisory authority over the plaintiff.  See id. at 182.

To establish a constructive discharge claim, Angulo must show that the Default Defendants, "rather than discharging [her] directly, intentionally create[d] a work atmosphere so intolerable that [she was] forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d Cir. 2003).  This is an objective inquiry in which the Court must assess whether the evidence has shown that Angulo's working conditions "bec[a]me so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]" Penn. State Police v. Suders, 542 U.S. 129, 141 (2004).  "Constructive discharge claims face a 'demanding' standard, Miller v. Praxair, Inc., 408 F. App'x 408, 410 (2d Cir. 2010) (summary order), 'even higher than that required to prevail on a hostile environment claim,' Mandel v. Champion Int'l Corp., 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005)." Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014).

To prove a prima facie case under the NYCHRL, Angulo need not demonstrate that she was subjected to "severe and pervasive" sexual harassment, only that she "'has been treated less well than other employees because of [her] gender.'"  Caravantes, 2012 WL 3631276, at *13 (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 78 (1st Dep't 2009)).  Although not relevant to liability under the NYCHRL, the "severity" and "pervasiveness" of the sexual harassment are "'applicable to [the] consideration of the scope of permissible damages.'" Id. at *13 n.25 (quoting Williams, 61 A.D.3d at 76)).

Here, Angulo's undisputed allegations in the Complaint, supplemented by her Affidavit, other evidence included in the Damages Submission, and her testimony, as summarized above,

supra Section I.A, prove the Default Defendants' liability under the NYSHRL and NYCHRL.  Angulo has established that Casey's conduct, including the May 9, 2016 sexual assault, followed by multiple occasions on which he propositioned her for a relationship, created a hostile work environment leading to her constructive discharge for which her employers, the Default Defendants, were liable.  See Redd, 678 F.3d at 180–82 (reversing denial of summary judgment because "[d]irect contract with an intimate body part," which plaintiff testified occurred three times, "constitutes one of the most severe forms of sexual harassment"); Munson, 2017 WL 4863096, at *3, *5 (holding that supervisor's multiple sexual propositions and improper touching were "sufficient to make out a hostile environment-constructive discharge claim" under Title VII as well as the NYSHRL and the NYCHRL); Garcia v. N.Y.C. Health & Hosps. Corp., No. 15 Civ. 2119 (DAB), 2016 WL 4097850, at *6 (S.D.N.Y. July 26, 2016) (holding that three instances of inappropriate touching without consent and one sexual proposition were sufficient to allege a hostile work environment).

In addition, the Court concludes that the nature of Casey's abuse, combined with the fact that he was the owner of her workplace, "left [Angulo] little recourse but to resign," and therefore establishes a constructive discharge claim.  Munson, 2017 WL 4863096, at *5; see also Pryor, 992 F. Supp. 2d at 261–62 (finding allegations that plaintiff "felt obliged to resign" after supervisor "subjected her to sexual advances and made several forcible attempts to kiss her" was sufficient to state a claim for constructive discharge under the NYSHRL and the NYCHRL); Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 301 (S.D.N.Y. 2011) (denying summary judgment where "the Court cannot say that no reasonable jury would find that being rubbed with

a supervisor's genitals, even if for ten seconds, would cause [a plaintiff's] working conditions to be such that he would feel compelled to resign").

Accordingly, I respectfully recommend that the District Court find that Angulo has demonstrated the Default Defendants' liability for sex discrimination, a hostile work environment, and constructive discharge under the NYSHRL and the NYCHRL.

**B.** **Damages**

The Court now turns to the question of whether Angulo has provided sufficient evidence to support her claimed damages.  Transatlantic Marine, 109 F.3d at 111; Bleecker, 2013 WL 5951162, at *6.  A plaintiff must establish her entitlement to damages through admissible evidence.  See Braccia v. D'Blass Corp., No. 08 Civ. 8927 (LTS) (KNF), 2011 WL 2848146, at *3 (S.D.N.Y. June 13, 2011), adopted by 2011 WL 2848202 (S.D.N.Y. July 18, 2011).

Angulo has submitted proposed findings of fact and conclusions of law supported by affidavits and documentary evidence.  (ECF Nos. 43, 55).  Angulo's affidavits are admissible to demonstrate her damages.  See Poulos, 2018 WL 37505058, at *4; Maldonado v. La Nueva Rampa, Inc., No. 10 Civ. 8195 (LLS) (JLC), 2012 WL 1669341, at *2 (S.D.N.Y. May 14, 2012), adopted by 2012 U.S. Dist. LEXIS 200251 (S.D.N.Y. Aug. 9, 2012).  In addition, Angulo appeared before the Court and testified concerning the events alleged in the Complaint and her damages. (See Tr.).  Based on Angulo's Damages Submission as well as her in-court testimony, the Court will analyze her request for compensatory and punitive damages.

Angulo seeks: (1) compensatory damages in the amount of $941,752.58; (2) punitive damages in the amount of $1,883,505.16; (3) prejudgment interest at the rate of 9%; (4) post-

judgment interest; (5) attorneys' fees in the amount of $33,642.50; and (6) costs in the amount of $850.66.  (ECF No. 54 at 29).  I address each category separately.

### 1. Compensatory damages

Under the NYSHRL and NYCHRL, Angulo may recover damages for "economic loss and for pain and suffering."  Munson, 2017 WL 4863096, at *7; see Moore v. Houlihan's Rest., Inc., No. 07 Civ. 3129 (ENV) (RER), 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011), adopted by 2011 WL 2462194 (E.D.N.Y. June 17, 2011).[9]  I will analyze these categories of compensatory damages in turn.

### a. Economic loss

A victim of employment discrimination is entitled to reasonable damages to make her "'whole for injuries suffered on account of unlawful employment discrimination.'"  Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975)).

### i. Back pay

Absent special circumstances, courts generally award back pay in employment discrimination cases.  See Carrero v. N.Y.C. Hous. Auth., 890 F.2d 569, 580 (2d Cir. 1989) ("An award of backpay is the rule, not the exception."); Moore, 2011 WL 2470023, at *4.  A plaintiff alleging employment discrimination is ordinarily required to mitigate her damages.  See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 908 (2d Cir. 1997); Moore, 2011 WL 2470023, at *5.  "This obligation is not an onerous one, and there is no requirement that a plaintiff be successful in

---

[9] Because Angulo has not asserted a Title VII claim, the Title VII damages cap is inapplicable here.  See Moore, 2011 WL 2470023, at *4 ("Although Title VII limits the amount of damages that may be awarded, the NYSHRL and NYCHRL do not.").

obtaining comparable work, only that . . . she make[] a good faith effort to do so." Nanjin v.

Dollar Mountain, Inc., No. 14 Civ. 5758 (WHP), 2015 WL 6125436, at *2 (S.D.N.Y. Sept. 25, 2015).

The burden to show lack of mitigation falls on defendants, and here, by failing to respond to her

Damages Submission, the Default Defendants have not asserted an affirmative defense of failure

to mitigate or otherwise challenged Angulo's evidence of her attempts to mitigate her damages,

such that it would therefore be unreasonable to award back pay. See Press v. Concord Mortg.

Corp., No. 08 Civ. 9497 (KTD), 2010 WL 3199684, at *2 (S.D.N.Y. Aug. 11, 2010) (awarding back

pay where defaulting defendants failed to meet their burden of showing plaintiff's "efforts to

seek employment have been insufficient as an attempt to mitigate his damages"); supra Section

I.A.5 (notwithstanding the damage caused by Angulo's sexual assault and termination, she has

continued to seek employment).

Courts typically calculate back pay as "the wages the employee would have earned from

the date of discharge to the date of reinstatement, along with lost fringe benefits such as vacation

pay and pension benefits . . . ." United States v. Burke, 504 U.S. 229, 239 (1992), superseded by

statute on other grounds, Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1605,

110 Stat. 1755, 1838; accord Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr.,

697 F.3d 209, 213 (2d Cir. 2012).   Where the plaintiff does not request reinstatement, her

"entitlement to back pay is generally reduced or eliminated when she obtains, or could have

obtained, employment elsewhere." Munson, 2017 WL 4863096, at *7; see Nanjin, 2015 WL

6125436, at *2 ("[I]f the plaintiff accepts employment, even if not comparable, the new

earning[s] are subtracted from the back pay award.").   Even a plaintiff who fails to mitigate "is

still entitled to an amount that would make [her] whole." Moore, 2011 WL 2470023, at *5. "To

determine lost back pay, [the] plaintiff's base annual compensation at the time of termination is multiplied by the length of time between termination and . . . the inquest." Gutierrez v. Taxi Club Mgmt., Inc., No. 17 Civ. 532 (AMD) (VMS), 2018 WL 3432786, at *7 (E.D.N.Y. June 25, 2018), adopted by 2018 WL 3429903 (E.D.N.Y. July 16, 2018); see Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 144–45 (2d Cir. 1993).

As a victim of unlawful discrimination under the NYSHRL and the NYCHRL, Angulo is entitled to back pay. See Daily v. Societe Generale, 108 F.3d 451, 455–58 (2d Cir. 1997) (awarding back pay to plaintiff who attended school after "diligent efforts to find work prove[d] fruitless" (internal citations omitted)). Angulo has demonstrated that she earned $1,000 to $1,500 per week working for Defendants, including minimum wage plus tips. (ECF No. 55-4 ¶¶ 63). In 2015, Angulo earned $33,768 at Katra and $2,161 at Taj II. (ECF No. 55-9 at 3–4). From January 1, 2016 until June 1, 2016, her resignation date, Angulo earned $17,401.25 working for Defendants. (ECF Nos. 55-4 ¶¶ 63–64; 55-9 at 2). Angulo approximates her monthly wage as $2,900.20. (ECF No. 54 at 16). Approximately 50 months have passed since Angulo's constructive discharge, and therefore, Angulo's gross back pay is $145,010 ($2900.20 x 50).

As detailed above, following her constructive discharge, Angulo was employed in several positions that partially mitigated her damages. See supra Section I.A.5. Angulo earned a total of $47,900.21 from this employment. (ECF Nos. 55-4 ¶¶ 62–90; 55-9–55-16; Tr. at 3–4). Deducting the amount Angulo has earned from the gross back pay equates to $97,109.79 ($145,010 – $47,900.21). Accordingly, I respectfully recommend that Angulo be awarded $97,109.79 in back pay.

### ii.   **Front pay**

Angulo requests a front-pay award for a four-year period in the amount of $95,877.99. (ECF No. 54 at 18).  "Front pay involves calculating economic losses that will be experienced by a plaintiff in the future, as a result of the unlawful conduct of the defendant." Gutierrez, 2018 WL 3432786, at *8; see Banks v. Travelers Cos., 180 F.3d 358, 364 (2d Cir. 1999).  The decision to award front pay "is entirely within the court's discretion, and it is designed to make the plaintiff whole." Gutierrez, 2018 WL 3432786, at *8.  "Factors to be considered in determining front pay include the age of the plaintiff and h[er] reasonable prospects of obtaining comparable employment," and "the ability of the plaintiff to mitigate damages in the future." Thomas v. iStar Fin., Inc., 508 F. Supp. 2d 252, 260–61 (S.D.N.Y. 2007), aff'd, 629 F.3d 276 (2d Cir. 2010) (per curiam).

Although Angulo resigned from her waitress position with Defendants, her decision to resign followed Casey's sexual assault and unwanted advances, which rendered her work environment so hostile that to remain would have been an on-going threat to her physical and mental health, as detailed above. See supra Section II.A.2.  Angulo is 27 years old, and although she has diligently searched for and secured other types of employment, none has lasted more than a few months, and none have paid her amounts comparable to the compensation she received while working for Defendants.  (Tr. at 3; 55-4 ¶¶ 62–80).  Angulo also testified that, because of Casey's assault, she is "uncomfortable" working with men, which has made finding and retaining employment difficult.  (Id. at 20).  This suggests that in the near future, she does not likely have a "reasonable prospect of obtaining comparable alternative employment." Osorio v. Source Enters., Inc., No. 05 Civ. 10029 (JSR), 2007 WL 683985, at *6 (S.D.N.Y. Mar. 2, 2007)

(internal citations omitted).  Thus, in these circumstances, I respectfully recommend that the District Court exercise its discretion to award front pay damages.  See Gutierrez, 2018 WL 3437386, at *8 (collecting cases awarding front pay).

Her request for four years of front pay is comparable to the length of time for which the Court recommends awarding back pay, and falls in the middle of the range other courts in this Circuit have awarded to plaintiffs who were victims of sexual harassment in the workplace and have struggled to find comparable employment.  See, e.g., Gutierrez, 2018 WL 3437386, at *8 (awarding three years of front pay); DeCurtis v. Upward Bound Int'l, Inc., No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *4 (S.D.N.Y Sept. 27, 2011) (awarding five years of front pay); Osorio, 2007 WL 683985, at *6 (awarding five years of front pay).  Accordingly, I respectfully recommend that the District Court award Angulo front pay for four years, reduced by the amount of her current salary, in the total amount of $100,937.76 (($2,900.20 − $797.33) x 48).[10]

### b.  Emotional distress

The NYSHRL and the NYCHRL entitle a successful plaintiff to compensatory damages for pain and suffering.  See Munson, 2017 WL 4863096, at *8.  The Second Circuit recognizes three types of emotional distress damages:  "garden-variety, significant, and egregious."  Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (internal quotations omitted); see Caravantes, 2012 WL 3631276, at *22 (internal citation omitted).  These categories have been explained as follows:

> In garden-variety claims, the evidence of emotional harm is limited to the
> plaintiff's testimony, which describes his or her injuries in vague or conclusory

---

[10] Angulo is presently employed by the City of New York as a contract tracer, earning $23 per hour for eight hours of work per week.  (Tr. at 4).  Therefore, her current monthly pay is $797.33 ($23 x 8 x 52 = $9,568 / 12 = $797.33).

> terms, and fails to relate the severity or consequences of the injury.  These claims
> typically lack extraordinary circumstances and are not supported by medical
> testimony.  Significant emotional distress claims are based on more substantial
> harm or offensive conduct and may be supported by medical testimony, evidence
> of treatment by a healthcare professional, and testimony from other witnesses.
> Egregious emotional distress claims yield the highest awards and are warranted
> only where the employer's conduct was outrageous and shocking or affected the
> physical health of the plaintiff.

Munson, 2017 WL 4863096, at *8 (quoting Maher v. All. Mortg. Banking Corp., No. 06 Civ. 5073 (DRH) (ARL), 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010), modified on other grounds and adopted by 2010 WL 3521921 (E.D.N.Y. Sept. 1, 2010)).  "'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards."  Nanjin, 2015 WL 6125436, at *3; Becerril v. E. Bronx NAACP Child Dev. Ctr., No. 08 Civ. 10283 (PAC) (KNF), 2009 WL 2611950, at *6 (S.D.N.Y. Aug. 18, 2009), adopted by 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009).  "'Significant'" emotional distress claims, which are "based on more substantial harm or more offensive conduct," and are sometimes supported by medical evidence or corroborating testimony, are usually valued in the range of $50,000 to $100,000.  Rainone, 388 F. Supp. 2d at 122–23.  "'Egregious'" emotional distress claims, involving awards in excess of $100,000, "exist where the discrimination alleged is 'outrageous and shocking or where the physical health of [the] plaintiff was significantly affected.'"  Moore, 2011 WL 2470023, at *6 (quoting Rainone, 388 F. Supp. 2d at 123).

"To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be 'supported by competent evidence' in addition to the plaintiff's subjective testimony."  Nanjin, 2015 WL 6125436, at *3 (quoting Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002).  "Important factors in assessing an appropriate amount to award for emotional suffering include 'the amount, duration, and consequences of [the

claimant's] emotional distress.'"  Jowers v. DME Interactive Holdings, Inc., No. 00 Civ. 4753 (LTS) (KNF), 2006 WL 1408671, at *12 (S.D.N.Y. May 22, 2016) (quoting Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190, 2003 WL 359462, at *14 (S.D.N.Y. Feb. 18, 2003)).

Considering Casey's sexual assault and on-going harassment of Angulo, her testimony regarding her emotional and physical health since the sexual assault, and the medical records corroborating Angulo's diagnoses with, inter alia, PTSD and bipolar disorder, the Court has no trouble concluding that Angulo suffered emotional distress that is at least "significant" and in some respects "egregious."  In particular, Angulo suffered physical violence when Casey sexually assaulted her, endured sexual harassment through his unwanted advances, and was constructively discharged from her well-paying job at Suite36.  As a result of Casey's conduct, Angulo abused drugs and alcohol, attempted suicide, struggled with an eating disorder, and experienced strained relationships with her friends and family.  See supra Section I.A.4.  For these mental and physical conditions, Angulo attended in-patient and out-patient rehabilitation, is under the regular care of a psychiatrist and therapist, and takes several medications.  See id.; Tr. at 11–13.

Nevertheless, I do not find that these circumstances warrant the $750,000 emotional distress award Angulo requests.  (ECF No. 54 at 22).  A review of other cases in which the plaintiff suffered a sexual assault reflects a trend of awarding emotional distress damages "in the low-to-mid hundreds of thousands of dollars."  See Offei v. Omar, No. 11 Civ. 4283 (SAS) (MHD), 2012 WL 2086294, at *5 (S.D.N.Y. May 18, 2012) (collecting cases awarding between $100,000 for single instance of "date rape" to over $1 million for multiple rapes over long periods of time (internal citations omitted)), adopted by 2012 WL 2086356 (S.D.N.Y. June 8, 2012).   Here,

although the sexual assault was a "onetime event," it did amount to a rape involving the use of force by Casey, "whose conduct was plainly exploitative," insofar as he used his status as Angulo's employer and took advantage of her vulnerable emotional state at the time. See id. at *6. Angulo graphically described her initial shock, anxiety, embarrassment, and anger, leading to her suicide attempts and abuse of drugs and alcohol. (ECF No. 55-4 ¶¶ 29–61). As a result of these conditions, she required hospitalization, out-patient treatment, therapy, and medication. See supra Section I.A.4. The Court also notes that in assessing compensatory damages, it is appropriate to consider the circumstance that, having previously been the victim of sexual assault when she was younger, Angulo had "increased susceptibility to emotional distress from sexual harassment." Mayo-Coleman v. Am. Sugar Holdings, Inc., No. 14 Civ. 79 (PAC), 2018 WL 2684100, at *4 (S.D.N.Y. June 5, 2018); see Stampf v. Long Island R.R. Co., 761 F.3d 192, 207 n.5 (2d Cir. 2014) ("[A] defendant must take a plaintiff as [he] finds [her] and, therefore, is responsible for the harm [he] inflicts on a person even if that harm is exacerbated by the person's unknown infirmities." (internal citation omitted)). It is therefore "evident that [she] should be awarded a substantial sum in compensation for the continued long-term psychic injuries that she has been suffering." Offei, 2012 WL 2086294, at *6.

Other cases involving comparable types of psychological injury reflect awards trending in the lower six-figures. See Garcia v. Comprehensive Ctr., LLC, No. 17 Civ. 8970 (JPO) (BCM), 2019 WL 8274296, at *7–8 (S.D.N.Y. Nov. 21, 2019) (awarding $175,000 in emotional distress damages to plaintiff who "suffered physical violence, harassment, and discrimination for more than a year, leading to psychological treatment" including therapy and medication for diagnoses of PTSD and major depressive disorder), adopted by 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); Gutierrez,

2018 WL 3432786, at *9–10 (recommending $130,000 emotional distress award where plaintiff endured severe and intense sexually harassing behavior that caused her migraine headaches, nausea, vomiting, sleep disorders, and anxiety lasting for over 18 months); Mayo-Coleman, 2018 WL 2684100, at *3, *5 (reducing emotional distress award from $1.7 million to $500,000 as "the greatest amount that can be awarded without being excessive" where plaintiff had both psychological and physical manifestations resulting from extreme sexual harassment); Caravantes, 2012 WL 3631276, at *23–24 (awarding $150,000 in emotional distress damages where supervisor's harassment caused plaintiff to suffer sleep disorders, marital problems, major depressive disorder, and suicidal thoughts); Gurung v. Malhotra, 851 F. Supp. 2d 583, 595 (S.D.N.Y. 2012) (awarding $500,000 in emotional distress damages to plaintiff kept prisoner as housekeeper for over three years); McGrory v. City of New York, No. 99 Civ. 4062 (FM), 2004 WL 2290898, at *6, *16 (S.D.N.Y. Oct. 8, 2004) (reducing emotional distress award to $100,000 for retaliatory termination); Katt v. City of New York, 151 F. Supp. 2d 313, 370–71 (S.D.N.Y. 2001) (upholding jury's emotional distress damages award of $400,000 where plaintiff suffered "permanent mental disabilities" and was unable to work as a result of defendant's sexual harassment).

Taking into account these precedents while recognizing that assessing a figure to compensate Angulo for all she has endured is an inexact science, I respectfully recommend that the nature and length of her emotional suffering, which continued through the date of the inquest hearing and will likely endure for years to come, justify an award for emotional distress in the amount of $300,000. Cf. Phillips v. Bowen, 278 F.3d 103, 111–12 (2d Cir. 2002) (upholding $400,000 compensatory damages award where plaintiff's boyfriend corroborated testimony

about her "emotional distress, physical illness, and effects of defendants' [discriminatory] conduct on her lifestyle and relationships"); <u>Offei</u>, 2012 WL 2086294, at *1, *4, *6–7 (recommending $250,000 in emotional distress damages to plaintiff who was violently groped, leading to panic attacks for which she received months of psychological treatment).

### 2. Punitive damages

Under the NYCHRL, a court may award punitive damages "'if the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"   <u>DeCurtis</u>, 2011 WL 4549412, at *5 (quoting <u>Manzo v. Sovereign Motor Cars, Ltd.</u>, No. 08 Civ. 1229 (JG) (SMG), 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010)).   The court may infer the requisite state of mind from the circumstances.   <u>See id.</u>   "'[E]gregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive.'"   <u>Id.</u> (quoting <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 538 (1999)).

When determining the amount of punitive damages, "courts should presume that the plaintiff has been made 'whole' through their compensatory damages award."   <u>Greathouse v. JHS Sec. Inc.</u>, No. 11 Civ. 7845 (PAE) (GWG), 2015 WL 7142850, at *7 (S.D.N.Y. Nov. 13, 2015) (quoting <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 419 (2003)), <u>adopted</u> <u>by</u> 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016).   A court should also be mindful that "the purpose of punitive damages is 'to punish the defendant and to deter him and others from similar conduct in the future.'"   <u>Id.</u> (quoting <u>Lee v. Edwards</u>, 101 F.3d 805, 809 (2d Cir. 1996)).

> Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct.  Nor is there any formula to determine the dollar amount needed to effectuate deterrence.

Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2013).

With these principles in mind, the Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." DeCurtis, 2011 WL 4549412, at *5 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)).

Based on Angulo's unopposed allegations of fact in her Complaint, supplemented by her Damages Submission and her in-court testimony, "the Court has no difficulty finding that punitive damages are warranted here." DeCurtis, 2011 WL 4549412, at *5. Casey's sexual assault of Angulo, along with his deliberate unwanted advances toward her in the workplace, were sufficiently reprehensible "that any reasonable employer must have known that [Angulo's] rights were being violated." Id.

Angulo seeks a punitive damage award of $1,883,505.16, twice the amount of her requested compensatory damages. (ECF No. 54 at 24). In considering the ratio of punitive damages to Angulo's compensatory damage award, it is appropriate to include both her economic and emotional distress damages. See Greathouse, 2015 WL 7142850, at *8 (collecting cases). Thus, the figure that Angulo requests is nearly four times the amount of compensatory damages the Court is recommending above, and thus "might be close to the line of constitutional impropriety." Campbell, 538 U.S. at 425; Greathouse, 2015 WL 7142850, at *8. Although the conduct here was not simply negligent, I respectfully recommend that an award of the magnitude Angulo requests is not justified, particularly in light of the relatively short duration of Casey's

misconduct, and "the fact that the individual who actually committed the outrageous conduct"
— Casey — "is not before the Court."  Munson, 2017 WL 4863096, at *9.

Considering Angulo's evidence in light of the factors set forth above and taking into
account the other relief the Court is recommending, the Court finds that a punitive damages
award of $100,000 would reflect Casey's physical attack on Angulo and "callous indifference" to
her rights while remaining within the range of awards in similar circumstances.  DeCurtis, 2011
WL 4549412, at *5 (internal citations omitted); see Garcia, 2019 WL 8274296, at *1, *9 (awarding
$75,000 in punitive damages to plaintiff whose supervisor called her abusive names, "slammed"
her laptop closed on her fingers, "closed-fist-punched" her in the face, and grabbed her by her
shirt collar and dragged her into his office); Manswell v. Heavenly Miracle Acad. Servs., Inc., No.
14 Civ. 7114 (MKB) (SMG), 2017 WL 9487194, at *1–4, *19 (E.D.N.Y. Aug. 23, 2017) (awarding
$100,000 in punitive damages where harasser repeatedly and aggressively propositioned plaintiff
for sex and made crude comments over an 18-month period); Offei, 2012 WL 2086294, at *1–4,
*8 (awarding $100,000 in punitive damages where defendant sexually assaulted plaintiff leading
to panic attacks, hospital treatment, and a need for anti-anxiety medication); DeCurtis, 2011 WL
4549412, at *1, *6 (awarding $75,000 in punitive damages to plaintiff whose supervisor groped
her, made sexually explicit comments, sent inappropriate emails, and regularly called her late at
night and on weekends to discuss sex).  Accordingly, I respectfully recommend that the District
Court award $100,000 in punitive damages against the Default Defendants.

### 3.  Prejudgment interest

Although the decision to award prejudgment interest rests in the discretion of the District
Court, "the Second Circuit has stated that '[t]o the extent . . . that the damages awarded to the

plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion <u>not</u> to include prejudgment interest.'"   <u>Shannon v. Fireman's Fund Ins. Co.</u>, 136 F. Supp. 2d 225, 230 (S.D.N.Y. 2001) (quoting <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 873 (2d Cir. 1998)).  Under New York law, which governs the claims Angulo has asserted in this action, "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."   N.Y. C.P.L.R. § 5004 (McKinney 1981).

Absent any basis to depart from ordinary practice, I respectfully recommend that the District Court award Angulo prejudgment interest at the rate of 9% on the amount awarded for back pay, $97,109.79.[11]

### 4.   Post-judgment interest

In a diversity case such as this one, "'post[-]judgment interest is governed by federal statute.'"   <u>Bleecker</u>, 2013 WL 5951162, at *9 (quoting <u>Schipani v. McLeod</u>, 541 F.3d 158, 165 (2d Cir. 2008)); <u>see</u> 28 U.S.C. § 1961(a).  Given that this civil case was filed in a federal district court, I respectfully recommend that Angulo be awarded post-judgment interest calculated according to the requirements of 28 U.S.C. § 1961(a).  <u>See Reiter</u>, 2003 WL 22271223, at *15 (awarding post-judgment interest under 28 U.S.C. § 1961(a)).

---

[11] Awarding prejudgment interest on emotional distress damages "is not the norm for New York federal courts," and is only done when necessary to "make the [plaintiff] whole."   <u>EEOC v. Everdry Mktg. & Mgmt., Inc.</u>, 556 F. Supp. 2d 213, 223–24 (W.D.N.Y. 2008); <u>see Kuper v. Empire Blue Cross & Blue Shield</u>, No. 99 Civ. 1190, 2004 WL 97685, at *2 (S.D.N.Y. Jan. 20, 2004) (noting that "the majority of New York federal courts have declined to grant prejudgment interest" on emotional distress damages).  Here, the Court has recommended an award of compensatory damages in an amount designed to make Angulo whole, and therefore, prejudgment interest on her emotional distress damages is not necessary.  <u>See DeCurtis</u>, 2011 WL 4549412, at *6 n.4 (declining to award prejudgment interest on emotional distress damages); <u>Reiter v. Metro. Transp. Auth. of N.Y.</u>, No. 01 Civ. 2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (same).

C.  **Attorneys' Fees**

Angulo requests an award of attorneys' fees in the amount of $33,642.50.  (ECF No. 54 at 29).

1.  **Legal standard**

A prevailing plaintiff may be awarded reasonable attorneys' fees and costs incurred in bringing claims under the NYCHRL.  N.Y.C. Admin. Code § 8-502(g).  "'[A] "reasonable" fee is a fee that is sufficient to induce a capable attorney to undertake the representation [in] a meritorious civil rights case.'"  DeCurtis, 2011 WL 4549412, at *6 (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010)).  Because the NYCHRL provisions are similar to those of Title VII, "the reasonableness of fees in [such a] case would be analyzed the same [way] . . . ."  Id. (internal citation omitted).

The district court has "broad discretion" to determine the amount to be awarded.  Vincent v. Comm'r of Soc. Sec., 651 F.3d 299, 307 (2d Cir. 2011).  In Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cty. of Albany, 522 F.3d 182 (2d Cir. 2008), the Second Circuit articulated the method for calculating reasonable attorney's fees:  a reasonable hourly rate multiplied by a reasonable number of hours expended on the work constitutes the "presumptively reasonable fee," also known as the "lodestar."  Id. at 183; see Kreisler v. Second Ave. Diner Corp., No. 10 Civ. 7592 (RJS), 2013 WL 3965247, at *1 (S.D.N.Y. July 31, 2013).  A court using the lodestar method sets the lodestar, then considers "whether, in light of variables such as the difficulty of the case, it should adjust the lodestar before settling on the reasonable fee . . . ."  Arbor Hill, 522 F.3d at 187.

To aid in the court's analysis, a fee application should be supported by "contemporaneous time records" relaying the rates charged and hours worked by each attorney. N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983). The attorneys "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983); see Themis Capital v. Democratic Republic of Congo, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (reducing hours by twenty percent for "impermissibly broad" block billing). A court should look at the "nature of the legal matter and context of the fee award in considering the reasonable rate and reasonable time spent on a matter." Tessemae's LLC v. Atlantis Capital LLC, No. 18 Civ. 4902 (KHP), 2019 WL 2635956, at *3 (S.D.N.Y. June 27, 2019).

To determine the hourly rate, a court considers "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289–90 (2d Cir. 2011) (internal citation omitted). In addition, the Second Circuit has a "forum rule" requiring the use of "hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." Id. at 290 (internal citation omitted). The court's determination of the reasonable hourly rate is aided by the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The court may adjust base hourly rates to account for case-specific variables such as the complexity of the issues and attorneys' experiences. See MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC, No. 16

Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (adjusting fees based on case-specific matters).

To determine the reasonable number of hours worked, the court should strike a balance "between principles of thoroughness and efficiency." LCS Grp. LLC v. Shire LLC, 383 F. Supp. 3d 274, 280 (S.D.N.Y. 2019). The court must examine "the amount of time spent on each task" and "decide how much of that time was reasonably expended given the scope and complexity of the particular litigation." Pichardo v. C.R. Bard, Inc., No. 09 Civ. 7653 (SHS), 2015 WL 13784565, at *4 (S.D.N.Y. Jan. 26, 2015) (internal citation omitted). The court should also consider the number of attorneys involved. Tessemae's LLC, 2019 WL 2635956, at *5. The court can rely on "its own familiarity with the case, as well as its experience with the parties' evidentiary submissions and arguments." Kreisler, 2013 WL 3965247, at *3. Time spent preparing a fee application may be awarded. See Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A., No. 11 Civ. 1529 (KMW) (KNF), 2015 WL 1062327, at *3 (S.D.N.Y. Mar. 3, 2015).

The court may reduce the hours spent on the litigation to exclude "'excessive, redundant, or otherwise unnecessary'" time. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (citing Hensley, 461 U.S. at 434); see LCS Grp., 383 F. Supp. 3d at 281 ("A court may apply an across-the-board reduction to effectuate the reasonable imposition of fees."); MSC Mediterranean Shipping Co., 2017 WL 1194372, at *3 (reducing fees for an unopposed motion for default judgment in a breach of contract case; excluding a senior partner's time because "[t]he matter did not warrant the involvement of two senior partners"; and cutting paralegal's time in half); see also Pichardo, 2015 WL 13784565, at *7 (reducing attorneys' hours by forty percent on one motion because only one relevant issue was addressed in the recorded time).

Ultimately, "[t]he essential goal in shifting fess (to either party) is to do rough justice, not to achieve auditing perfection." <u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011).

### 2. <u>Application</u>

The time records Angulo has submitted reflect a total of 118.9 hours by the attorneys and legal staff at the firm of Phillips & Associates, PLLC ("Phillips"). (ECF No. 54 at 27–29). Stanciu, Angulo's lead counsel, who has been an employment litigator for four years, worked 72.55 hours on this matter at a rate of $350.00 per hour. (<u>Id.</u> at 26–27). Kenneth Abeyratne ("Abeyratne"), a junior associate at Phillips who has been practicing law for one year, worked 26.1 hours at a rate of $200.00 per hour. (<u>Id.</u> at 27–28). Max Bracero ("Bracero"), a law clerk at Phillips who was admitted to the New York bar in February 2020, worked 10 hours at a rate of $150.00 per hour. (<u>Id.</u> at 28). Marialyn Acevedo ("Acevedo"), a paralegal at Phillips, worked 10.2 hours at a rate of $150.00 per hour. (<u>Id.</u> at 28–29).

### a. <u>Hourly rates</u>

With respect to the reasonableness of the rate requested for Stanciu, other courts in this District awarding attorneys' fees in employment discrimination cases have found that "'the range of fees in this District for "seasoned civil rights litigators," particularly those in small firms, is between $200/hr and $300/hr.'" <u>Munson</u>, 2017 WL 4863096, at *11 (quoting <u>Pascuiti v. N.Y. Yankees</u>, 108 F. Supp. 2d 258, 266 (S.D.N.Y. 2000)); <u>accord</u> <u>Gurung</u>, 851 F. Supp. 2d at 597 ("Courts in this District have determined in recent cases that the range of appropriate fees for experienced civil rights and employment law litigators is between $250 and $450.").

Stanciu had been practicing law for approximately three years when this case was filed, but her requested hourly rate of $350 is more suitable for attorneys with lengthier experience in

more complex cases, despite the relatively straightforward nature of this case and the fact of

default.  See, e.g., Munson, 2017 WL 4863096, at *10–11 (awarding $300 per hour to "senior

counsel" with "significant experience handling civil rights matters" in "straightforward" default

employment discrimination case); Liang Huo v. Go Sushi Go 9th Ave., No. 13 Civ. 6573 (KBF), 2014

WL 1413532, at *7–8 (S.D.N.Y. Apr. 10, 2014) (awarding $350 per hour to plaintiff's counsel who

had been practicing primarily in employment law for over ten years).  For an associate with two

to four years' experience, comparable to Stanciu, other courts in this District have found a

reasonable hourly rate to be $250 to $275.  See Velandia v. Serendipity 3, Inc., No. 16 Civ. 1799

(AJN), 2018 WL 3418776, at *4 (S.D.N.Y. July 12, 2018) ("Courts in this District routinely approve

of an hourly rate for associates between $200 and $300."); Euro Pac. Capital, Inc. v. Bohai Pharm.

Grp., No. 15 Civ. 4410 (VM) (JLC), 2018 WL 1229842, at *8 (S.D.N.Y. Mar. 9, 2018) (finding hourly

rate of $250 reasonable for attorneys with one to eight years' experience), adopted by 2018 WL

1596192 (S.D.N.Y. Mar. 28, 2018); Munson, 2017 WL 4863096, at *11 (awarding $250 hourly rate

to associate with three years' experience); Galeana v. Lemongrass on Broadway Corp., 120 F.

Supp. 3d 306, 324 (S.D.N.Y. 2014) (awarding $250 hourly rate to junior associate with

employment litigation focus); Clark v. Gotham Lasik, PLLC, No. 11 Civ. 1307 (LGS), 2013 WL

4437220, at *7 (S.D.N.Y. Aug. 20, 2013) (awarding $275 hourly rate to fourth-year associate);

Gurung, 851 F. Supp. 2d at 596–97 (awarding hourly rate of $275 to third-year associates);

DeCurtis, 2011 WL 4549412, at *7–8 (awarding $275 hourly rate to fifth year associate with

employment litigation focus); see also Canaveral v. Midtown Diner NYC, Inc., No. 19 Civ. 635

(GBD) (JLC), 2019 WL 4195194, at *8–9 (reducing Stanciu's hourly rate from requested amount

of $350 to $200 in wage-and-hour litigation), adopted by 2019 WL 6170058 (S.D.N.Y. Nov. 19,

2019).  Given this jurisprudence, Abeyratne's requested rate of $200 appears reasonable for his

one year of experience.  Accordingly, I respectfully recommend a reasonable hourly rate of $250

for Stanciu and $200 for Abeyratne.

Bracero was a law clerk who performed tasks similar to a paralegal at an hourly rate of

$150, the same rate as Acevedo.  (ECF No. 54 at 28).  Hourly rates for paralegals of $100 to $150

are typical for awards in this District.  See Perez Garcia v. Hirakegoma Inc., No. 17 Civ. 7608 (SLC),

2020 WL 1130765, at *12 (S.D.N.Y. Mar. 9, 2020) (collecting cases).  Given Bracero's status as a

law clerk, and his and Acevedo's relatively small role in this matter, the Court finds that an hourly

rate of $100 is reasonable for each of them.  See id. (applying hourly rate of $100 to paralegal);

Canaveral, 2019 WL 4195194, at *8 (applying $100 hourly rate to Acevedo).

### b.  Hours expended

The Court has examined the contemporaneous records that identify, for each timekeeper,

the hours expended on each task (ECF No. 55-20) "with a view to the value of the work product

of the specific expenditures to the client's case."  Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d

Cir. 1997).

For the period May 2019 until May 2020, four timekeepers worked a total of 118.9 hours

on this matter.  (ECF No. 55-20).  There are a few entries of vague or duplicative work.  (See, e.g.,

id. at 2–3 (multiple entries for "legal research," entry for "editing and research")).  In addition,

there are several entries where Stanciu performed administrative work more appropriate for a

paralegal than for the most senior attorney on the case.  (See id. at 2 ("filed complaint," "filed

affidavit," "filed stipulation")).  The Court finds that this quantity of hours for a straightforward

employment  discrimination  case  involving  primarily  default  motion  practice  is  greater  than

necessary, and that a 10% reduction to the quantity of hours for which fees will be awarded for each timekeeper is appropriate here.  See Canaveral, 2019 WL 4195194, at *9–10 (reducing hours by 40% due to attorney's billing for administrative tasks and taking into account "speedy resolution by default judgment"); HTV Indus., Inc. v. Agarwal, 317 F. Supp. 3d 707, 725 (S.D.N.Y. 2018) (applying 25% reduction in attorneys' fees); Bank of Am., N.A. v. Brooklyn Carpet Exch., Inc., No. 15 Civ. 5981 (LGS) (DF), 2016 WL 8674686, at *11 (S.D.N.Y. May 13, 2016) (same), adopted by 2016 WL 3566237 (S.D.N.Y. June 27, 2016); Johnson v. Strive E. Harlem Emp't Grp., No. 12 Civ. 4460 (HB), 2014 WL 308347, at *1 (S.D.N.Y. Jan. 28, 2014) (reducing attorneys' fees by 10%); Angamarca v. Pita Grill 7 Inc., No. 11 Civ. 7777 (JGK) (JLC), 2012 WL 3578781, at *13 (S.D.N.Y. Aug. 2, 2012) (reducing attorneys' fees by 15%), adopted by 2012 U.S. Dist. LEXIS 190479 (S.D.N.Y. Dec. 14, 2012); see also Carey, 711 F.2d at 1146 (noting that a percentage reduction may be applied "as a practical means of trimming fat from a fee application").

Application of the Court's recommended reductions to the four timekeepers' hourly rates and hours expended results in the following lodestar calculation:

| Timekeeper | Requested Rate | Awarded Rate | Actual Hours | Hours Reduced by 10% | Total |
|---|---|---|---|---|---|
| S. Stanciu | $350 | $250 | 72.55 | 65.3 | $16,325 |
| K. Abeyratne | $200 | $200 | 26.1 | 23.5 | $4,700 |
| M. Bracero | $150 | $100 | 10 | 9 | $900 |
| M. Acevedo | $150 | $100 | 10.2 | 9.2 | $920 |
| TOTAL | | | | | $22,845 |

Courts in the Second Circuit "maintain[] a strong presumption that the lodestar is reasonable."  Kreisler, 2013 WL 3965247, at *1.  Given that the Court has already applied reductions to some of the hourly rates as well as to the total number of hours as set forth above, the Court finds that a further adjustment is not necessary.  Angulo has prevailed on her

employment discrimination claims, and the Court has not identified any other excessive or unnecessarily billed items.  See id. at *4 (reducing lodestar amount by 30% where plaintiff did not prevail on all claims and counsel billed travel time at full rates).  Accordingly, there are no extraordinary circumstances here that would warrant any adjustment to the lodestar of $22,845, and I respectfully recommend this amount as a reasonable award of attorneys' fees.

### D. Costs

Angulo seeks reimbursement of costs in the amount of $850.66 for the following expenses:  (1) $400.00 in filing fees; (2) $40.00 for filing with the Secretary of State; (3) $30.00 for process servers; (4) $34.66 for postage and delivery; and (5) $336.00 for medical record costs.[12]  (ECF No. 54 at 29; see also ECF No. 55-21).  Angulo has substantiated her filing, Secretary of State filing, process server, and postage costs with adequate documentation, but has failed to substantiate the full amount of medical record costs.  (ECF No. 55-21 at 2 (medical "transcript[]" costs totaling $276.00)); see Sanchez v. JYP Foods Inc., No. 16 Civ. 4472 (JLC), 2018 WL 4502008, at *17 (S.D.N.Y. Sept. 20, 2018) (noting that adequate substantiation is required for an award of costs); Raymond James & Assocs., Inc. v. Vanguard Funding, LLC, No. 17 Civ. 3327 (VSB) (SDA), 2018 WL 8758763, at *6 (S.D.N.Y. Apr. 16, 2018) (awarding documented expenses for, inter alia, filing and service of process fees), adopted by 2019 WL 2281275 (S.D.N.Y. May 28, 2019). Accordingly, I respectfully recommend an award of costs for the full amount claimed for filing fees, Secretary of State filing fees, process servers, and postage and delivery, but only $276.00 in costs for medical records.  The Court may also take judicial notice of the filing fees reflected on

---

[12] The Court notes that the amounts requested total $840.66 ($400.00 + $40.00 + $30.00 + $34.66 + $336.00).  (ECF No. 54 at 29).

the docket as support for an award of those costs.  See Whitehead, 2019 WL 384446, at *6 (taking

judicial notice of $400 filing fee and awarding costs in that amount); BWP Media USA Inc. v. Uropa

Media, Inc., No. 13 Civ. 7871 (JSR) (JCF), 2014 WL 2011775, at *4 (S.D.N.Y. May 16, 2014) (same),

adopted by 2014 U.S. Dist. LEXIS 106713; Lee v. Santiago, No. 12 Civ. 2558 (PAE) (DF), 2013 WL

4830951, at *14 (S.D.N.Y. Sept. 10, 2013) (recommending costs award of $350 filing fee listed on

docket).  In addition, these costs are of the type "normally incurred and charged to clients" and

therefore appropriate for reimbursement.  DeCurtis, 2011 WL 4549412, at *9.  Accordingly, I

respectfully recommend an award of costs in the amount of $780.66.

### III.        CONCLUSION

For the reasons set forth above, I respectfully recommend that the District Court enter a

default judgment against the Default Defendants awarding Angulo:  (1) $498,047.55 in

compensatory damages; (2) $ 100,000 in punitive damages; (3) prejudgment interest at the rate

of 9% on the amount of back pay awarded, that is, $97,109.79; (4) post-judgment interest

pursuant to 28 U.S.C. § 1961(a); (5) $22,845 in attorneys' fees; and (6) $780.66 in costs.


Dated:        New York, New York
              July 31, 2020

_____
SARAH L. CAVE
United States Magistrate Judge

*              *              *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F).   A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Daniels.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).